# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JULIE HUFF,<br>    *Plaintiff*,<br><br>v.<br><br>CHRISTOPHER REEVES, Oklahoma<br>Highway Patrolman,<br>KEVIN LEDBETTER, McIntosh County<br>Sheriff,<br><br>    *Defendants*,[1] | Case No. CIV-18-022-RAW |

## ORDER

On January 21, 2016, a bank robber took Plaintiff hostage at gunpoint and forced her to drive him several miles. After law enforcement stopped the vehicle, the bank robber used her as a human shield and exchanged gunfire with law enforcement. Plaintiff was struck multiple times. Plaintiff timely filed this action on January 17, 2018. She filed her Second Amended Complaint on August 31, 2018.

Plaintiff brings § 1983 claims under the Fourth Amendment for excessive force and under the Fourteenth Amendment for violation of her substantive due process rights against Oklahoma Highway Patrolman, Christopher Reeves ("Trooper Reeves"). She brings § 1983 claims for inadequate training against McIntosh County Sheriff, Kevin Ledbetter ("Sheriff Ledbetter"). Now before the court are the motions for summary judgment by Sheriff Ledbetter

---

[1] Defendants Don Murray and Casey Torrix were dismissed without prejudice on December 19, 2018 [Docket No. 86]. Following a settlement agreement, the City of Eufaula was dismissed on January 21, 2020 [Docket No. 192].

[Docket No. 130] and Trooper Reeves [Docket No. 131]. Both Defendants argue that they did not violate Plaintiff's Constitutional rights and assert the defense of qualified immunity.

I.  **Standard of Review**

The court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In applying the summary judgment standard, the court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006). At this stage, however, Plaintiff may not rely on mere allegations, but must have set forth, by affidavit or other evidence, specific facts in support of her Second Amended Complaint. *Id.*

"Conclusory allegations that are unsubstantiated do not create an issue of fact and are insufficient to oppose summary judgment." *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1136 (10th Cir. 2003) (citation omitted).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

While at the summary judgment stage evidence need not be submitted in a form that would be admissible at trial, the substance of the evidence must be admissible. For example, the

2

court disregards "inadmissible hearsay statements *contained* in affidavits, as those statements could not be presented at trial in any form." *Id.* (emphasis in original). "[A]ffidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). Similarly, "[t]estimony which is grounded on speculation does not suffice to create a genuine issue of material fact to withstand summary judgment." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 876 (10th Cir. 2004).

Additionally, unauthenticated documents "cannot support a summary judgment motion, even if the documents in question are highly probative of a central and essential issue in the case." *Bell v. City of Topeka, Kan.*, 496 F.Supp.2d 1182, 1185 (D. Kan. 2007) (citation omitted). "To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo*, 452 F.3d at 1199.

### *Qualified Immunity*

The affirmative defense of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

When a defendant raises a qualified immunity defense in response to a motion to dismiss or a motion for summary judgment,[2] the burden shifts to the plaintiff and the court employs a

---

[2] "The legally relevant factors for a qualified immunity decision will be different at the summary judgment state – no longer can the plaintiffs rest on facts as alleged in the pleadings." *Stonecipher v. Valles*, 759 F.3d 1134, 1148, n.9 (10th Cir. 2014).

two-part test.  *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012); *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011).  The burden is a heavy one.  *Perry v. Durborow*, 892 F.3d 1116, 1120 (10th Cir. 2018).  A plaintiff must show that: (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established at the time of the defendant's alleged misconduct.  *Id.*

"A plaintiff may show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation."  *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (citation omitted).  A law is not clearly established unless existing precedent has "placed the statutory or constitutional question beyond debate."  *Id.* (citation omitted).  This is an objective test.  *Brown*, 662 F.3d at 1164.

The court must not "define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (citing *Ashcroft*, 563 U.S. at 742); *Knopf*, 884 F.3d at 944 (citing *Ashcroft*, 563 U.S. at 742).  A prior case need not have *identical* facts.  *Perry*, 892 F.3d at 1126; *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017).  Still, the "clearly established law must be 'particularized' to the facts of the case."  *Knopf*, 884 F.3d at 944 (citation omitted).

A plaintiff must establish both prongs to defeat a qualified immunity defense.  *Id.*  Only if a plaintiff first meets this two-part test does the defendant bear the traditional summary judgment burden to show that there are no genuine disputes of material fact and that he or she is entitled to summary judgment as a matter of law.  *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011).  The court has discretion to decide which of the two prongs to address first in light of the circumstances of the case.  *Brown*, 662 F.3d at 1164.

4

## II. **Undisputed Material Facts**[3]

On the morning of January 21, 2016, Cedric Norris robbed the Bank of Eufaula. *Docket No. 131, at 9*. He shot and killed the bank president, shot and wounded a bank employee, and attempted to shoot a third employee before taking Plaintiff hostage at gunpoint and leaving the bank. *Id*. Once outside the bank, Norris told Plaintiff to get in the driver's seat of a white sport utility vehicle ("SUV") and drive. *Docket No. 130, at 9*. Plaintiff drove north onto US 69. *Id*. Norris reloaded his gun while Plaintiff was driving. *Id.* About a mile after entering the highway, Plaintiff saw a white law enforcement vehicle behind her with its emergency lights and sirens on. *Id.* Later, a second law enforcement vehicle, a black cruiser, joined the chase and passed the white law enforcement vehicle, coming up directly behind Plaintiff and Norris. *Id*.

### ***Trooper Reeves***

Trooper Reeves was on patrol that morning and heard a McIntosh County radio transmission alerting law enforcement about the armed robbery and stating that two people had been shot. *Docket No. 131, at 9*. The radio transmission informed law enforcement that two women, one white and one black, were driving a white SUV and traveling north on US 69. *Id. at 10*. A City radio transmission included notification that Plaintiff was a hostage. *Docket No. 154 at 5*. Trooper Reeves did not access the City transmission when that information was broadcast, however, and did not inquire of the status of the individuals in the suspect vehicle.[4] *Id*.

When he heard the radio transmission, Trooper Reeves immediately turned around and started driving toward Texanna Road. *Docket No. 131, at 9*. Trooper Reeves believed Texanna

---

[3] For clarity and consistency herein, when the court cites to the record, it uses the pagination assigned by CM/ECF.
[4] Plaintiff adds this undisputed material fact, but later argues that Trooper Reeves knew and disregarded the fact that she was a hostage. Plaintiff has introduced no evidence, however, showing that Trooper Reeves knew she was a hostage.

Road would be a critical area to stage, as it was the only nearby exit the suspects could take if they chose to exit US 69. *Id*. at 10. Trooper Reeves waited at Texanna Road, and when he saw the white SUV traveling northbound on US 69 with a Eufaula Police unit in pursuit with its emergency lights and sirens on, he followed and caught up to the pursuit. *Id*.

Trooper Reeves changed his radio frequency to the City transmission and asked the officer in pursuit, Eufaula Police Officer Torrix, if he was pursuing the robbery suspect. *Id*. Officer Torrix confirmed that he was in pursuit of the robbery suspect. *Id*. Trooper Reeves then asked Officer Torrix to back off so that Trooper Reeves could perform a tactical vehicle intervention ("TVI") on the suspect vehicle. *Id*. Trooper Reeves then changed his radio frequency back to McIntosh County. *Id*. Trooper Reeves took over the lead of the pursuit because he did not believe Officer Torrix would be able to stop it, and it was clear the suspect had no intention of yielding or stopping. *Id*.

Plaintiff and Norris took the Onapa Road exit from US 69. *Id*. at 11. When they got to the stop sign at Onapa Road, Plaintiff accelerated and turned west. *Id*. Trooper Reeves believed the suspects were leading him to an isolated area to kill him. *Id*. He knew he needed to end the pursuit by performing a TVI. *Id*. As he was about to perform the TVI, another patrol vehicle driven by McIntosh County Deputy Hall pulled off the exit ramp and attempted to block the suspect vehicle. *Id*. The suspect vehicle made no attempt to slow down or stop for the patrol vehicle. *Id*. Plaintiff testified that Norris fired two rounds through the windshield of the suspect vehicle at Deputy Hall's vehicle when he tried to block them on the overpass on Onapa Road. *Id. at 16*.

Trooper Reeves moved in again to attempt the TVI, but realized there was a bait shop on the south side of the road and trees to the north, so he decided to wait until they had passed that

area. *Id.* at 11. When a field was on the south side of the road, Trooper Reeves performed the TVI. *Id.* The suspect vehicle rotated around and struck a telephone pole. *Id.* Trooper Reeves knew he had to get to a position that provided cover quickly, as he believed the suspects were going to use force against him. *Id.* Trooper Reeves braked very hard and stopped his unit on Onapa Road, facing the southwest. *Id.*

As soon as Trooper Reeves put his unit in park, the driver and passenger doors of the SUV opened.[5] *Id.* Trooper Reeves saw the tip of the revolver's barrel come out of the passenger side. *Id.* Before Trooper Reeves could exit his unit, Norris pointed the gun at him and began taking fire. *Id.* Trooper Reeves saw Norris point the gun in the direction of Officer Torrix as well. *Id.* Plaintiff testified that after Trooper Reeves performed the TVI, Norris got out of the suspect vehicle and fired two shots. *Id.* at 12.

While Trooper Reeves was attempting to take cover behind his unit, he returned fire and saw Norris standing, in an aggressive manner, with a gun in his right hand and pointed at him. *Id.* Trooper Reeves saw Norris fire the gun, one handed and thought he was trying to kill everyone. *Id.*

Trooper Reeves fired his gun to a lock back position, dropped down to a knee behind his unit for cover and reloaded his gun. *Id.* While down, Trooper Reeves heard a lot of gunshots and thought multiple people were shooting at him. *Id.* When Trooper Reeves looked back over the top of his unit, he saw Norris in front of the white SUV, running toward the southeast with the gun still pointed at him. *Id.*

---

[5] Plaintiff exited the driver side door. The court includes the undisputed material facts describing the shooting from her perspective below.

Trooper Reeves continued to engage Norris with slight alignment and a clear front sight. *Id*. Trooper Reeves saw Norris going down to his knees and keeping the gun pointed at him. *Id*. Trooper Reeves shot to another lock back, ducked down behind his unit for cover and reloaded a second time. *Id*. When Trooper Reeves looked back over his unit, he saw Norris get into a prone position with the gun still in hand and pointed at him and thought Norris was still a threat. *Id*. Norris was positioned directly behind Plaintiff and using her for cover. *Docket No. 154 at 6*. Trooper Reeves stopped shooting after Norris went face down on the ground. *Docket No. 131, at 12*. The gun was above Norris' head, and his hands were no longer on the gun. *Id*.

Trooper Reeves then felt there was no longer an immediate threat, so he went to his front passenger door to retrieve his rifle and contact headquarters by radio to advise that shots had been fired and to request emergency medical services ("EMS"). *Id*. at 13. While Trooper Reeves was in the process of retrieving his rifle and making the radio call, he heard two more shots being fired. *Id*. Trooper Reeves was unaware of how many rounds were left in his pistol and did not think it was a good idea to advance with it, so he retrieved his rifle and loaded one round in the chamber. *Id*.

Trooper Reeves walked around his unit and saw Trooper Cox behind the Eufaula Police patrol car to his left. *Id*. They communicated to each other with a head nod and advanced forward to secure Norris. *Id*. As the troopers advanced, they saw two people on the ground – Plaintiff and Norris. *Id*. at 14. Trooper Reeves secured the weapon, gave it to a deputy and placed handcuffs on Norris. *Id*. Plaintiff told Troopers Reeves and Cox that she was a hostage. *Id*. Norris was not moving or talking. *Id*. Plaintiff was wounded and needed medical care, so she was not handcuffed. *Id*.

Trooper Reeves stated that based on the general broadcast describing a white female suspect and a black female suspect, Plaintiff's aggressive driving and acceleration, and the way she moved around in the SUV, he believed she was an active participant and suspect.[6] *Id*. Several hours after the shooting, Trooper Reeves learned that Plaintiff was, in fact, a hostage.[7] *Id. at 15*.

Although she was in plain view when she exited the suspect vehicle, Trooper Reeves avers that he did not see her after the suspect vehicle came to a stop. *Id*. Plaintiff testified Trooper Reeves was close enough to clearly see her and that after she exited the suspect vehicle, she was shot in the thigh and forearm and then fell to the ground. *Docket No. 154 at 7 and 8*. Trooper Reeves avers that he did not see Plaintiff until he and Trooper Cox approached Norris.[8] *Docket No. 131 at 15*.

Officer Torrix and Deputy Hall were also in pursuit of the suspect vehicle, were shot at by Norris and returned fire. *Id*. Deputy Hall fired at least twice at Norris, who was in a prone position and firing at Officer Torrix. *Id*. Officer Torrix returned fire when he was being shot at by Norris. *Id*.

### *Sheriff Ledbetter*

Sheriff Ledbetter is the Sheriff of McIntosh County and was serving in that capacity at the time relevant to this action. *Docket No. 130 at 13*. He was not personally involved in the

---

[6] Plaintiff argues that Trooper Reeves should have known she was a hostage because he should have inquired of the status of the individuals in the suspect vehicle.

[7] Plaintiff argues that this fact contradicts Trooper Reeves earlier stated fact that Plaintiff told him she was a hostage when he approached her on the ground. It does not. Trooper Reeves stated that he thought Plaintiff was an active participant and suspect, so he had no reason to believe her.

[8] Plaintiff argues that because she was in plain sight when she exited the suspect vehicle and when she was on the ground, Trooper Reeves must have seen her and is culpable if he failed to see her.

pursuit or apprehension of Norris and was not present on Onapa Road until after the incident had concluded. *Id*.

The McIntosh County Sheriff's Office has policies in place that specifically prohibit the use of excessive force. *Id*. One such policy specifically provides that "Members of the Sheriff's Office are prohibited from using excessive force or violence against any person." *Id*. Officers who are trained and certified by the Oklahoma Council on Law Enforcement Education and Training ("CLEET") are trained that it is necessary and proper to attempt to disable a threat. *Id*. They are trained not to purposefully attempt to harm an individual who is not a threat to that officer, other officers, or the general public. *Id*. McIntosh County Deputies are required to receive yearly training on law enforcement issues, including appropriate use of force. *Id*.

### *Deputy Hall*

At the times relevant to this suit, Deputy Hall was serving as Chief Deputy of the McIntosh County Sheriff's Office. *Id*. at 12. Deputy Hall is certified as a law enforcement officer in the State of Oklahoma by CLEET. *Id*. He completed the requisite training through CLEET and earned his CLEET certificate in 2001. *Id*. Deputy Hall completes yearly training on law enforcement issues, as required by CLEET and the McIntosh County Sheriff's Office. *Id. at 13*.

On the morning of January 21, 2016, Deputy Hall was on duty in his black SUV when he heard over his police radio that the Bank of Eufaula had been robbed and two people had been shot. *Id. at 9*. The robbery suspects were reported to be two females driving a white SUV. *Id.* Deputy Hall was driving south on US 69 towards Eufaula with his emergency lights and sirens activated when he heard that other law enforcement officers were in pursuit of the suspect vehicle northbound on US 69. *Id. at 10*. Plaintiff exited from US 69 onto Onapa Road, and

10

Deputy Hall attempted to intercept the vehicle in his SUV as it was coming toward him. *Id*. Plaintiff swerved to avoid Deputy Hall and continued driving past him on Onapa Road with two patrol vehicles in pursuit while Norris fired two shots through the windshield. *Id*.

Once the suspect vehicle and the other two law enforcement vehicles had passed him, Deputy Hall turned around and followed. *Id*. By the time Deputy Hall caught up with the suspect vehicle and the other law enforcement officers, he saw a female (later known to him as Plaintiff) laying on the ground and a male (later known to him as Norris) behind Plaintiff shooting at Officer Torrix. *Id. at 11*. He stated that he saw Plaintiff on the ground with Norris laying close behind her on his stomach using her as a shield. *Docket No. 156 at 6*. Deputy Hall was the last law enforcement officer to arrive on the scene while the shooting was still occurring. *Id*.

Deputy Hall took cover behind his vehicle, assessed Norris as a threat and fired two shots at his torso. *Docket No. 131 at 11*. Deputy Hall never aimed at Plaintiff.[9] *Id*.

At all times prior to the conclusion of the incident on Onapa Road, Deputy Hall had been advised and believed that both of the occupants of the escaping white SUV were suspects in the bank robbery.[10] *Id. at 12*.

### ***The Shooting from Plaintiff's Perspective***

Once Officer Reeves stopped the suspect vehicle, in an attempt to escape Norris, Plaintiff got out. *Docket No. 154 at 8*. She did not have anything in her hands when she exited the vehicle. *Id*. She never saw Norris again after she exited the vehicle. *Id*. Plaintiff ran along the

---

[9] Plaintiff disputes whether Deputy Hall's bullets hit her, but she does not dispute or offer any evidence with regard to his intentions. Ultimately, whether his bullets were the ones that hit her is immaterial in any event.
[10] Plaintiff argues the Deputy Hall should have determined that she was a hostage.

11

fence line to an opening and ran into the field with her hands up. *Id*. Plaintiff did not scream for help as she was running. *Docket No. 130 at 10*. She then turned and faced law enforcement with her hands up and was immediately shot in the thigh and forearm, causing her to fall to the ground. *Docket No. 154 at 8*. Plaintiff continued to get shot while lying on the ground unable to move. *Id*. at 9. Plaintiff cried out, "Stop shooting me. Stop shooting me." *Id*.

At some point, Plaintiff sensed that Norris was behind her. *Id*. She heard a gunshot behind her right ear and knew that Norris was next to her. *Id*. That was the only time she heard him fire when they were on the ground. *Id*. Before that, he had fired two shots at Deputy Hall through the windshield and two shots when he exited the suspect vehicle. *Id*. He had a six shooter. *Id*. Plaintiff testified that she continued to get shot after Norris fired his last shot. *Id*. Plaintiff was shot multiple times, including twice on her backside, butt and hip, and once in the back of her head. *Id. at 10 and 11*.

## III. <u>Analysis</u>

Plaintiff brings § 1983 claims against Trooper Reeves, alleging that he shot her while she was standing facing law enforcement with her hands up and also while she was lying on the ground. Plaintiff brings § 1983 claims against Sheriff Ledbetter for the actions of Deputy Hall, alleging that he shot her while she was lying on the ground

### *<u>Trooper Reeves</u>*

Plaintiff brings claims pursuant to the Fourth Amendment for excessive force and pursuant to the Fourteenth Amendment for violation of her substantive due process rights. Before getting to the substance of those claims, the court briefly discusses Plaintiff's cornerstone arguments with regard to what Trooper Reeves should have known and should have seen.

Plaintiff argues that Trooper Reeves either knew or should have known that she was a hostage. This argument assumes that an officer may return gunfire in the direction of an unarmed, non-threatening, non-fleeing suspect, but may not return gunfire in the direction of a hostage. As discussed below, this is not the law. Ostensibly recognizing she is making a distinction without a difference, she also asserts that if he did not know she was a hostage, he should have known that she was attempting to surrender, unarmed, not threatening him, not advancing on him, and not attempting to flee.

Plaintiff further alleges that Trooper Reeves either saw her and intentionally shot through her to get to Norris[11] or that he is liable because he *should have* seen her and withheld his fire. Trooper Reeves was under fire before he even exited his patrol unit. He averred that he did not see Plaintiff at any time when he was returning Norris' fire – not when she was standing with her hands up facing law enforcement, and not when she was on the ground. There is no evidence that Trooper Reeves saw and intentionally shot her. There is also no evidence that he was deliberately indifferent.[12]

The Fourth Amendment protects individuals from unreasonable seizures. "Violation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs

---

[11] Plaintiff argues that Trooper Reeves "intentionally targeted Julie Huff when she was standing in the clear with her hands in the air nowhere near her abductor." *Docket No. 154 at 21*. She has presented no evidence to substantiate such an allegation.

[12] The court notes that Plaintiff takes a portion of Trooper Reeves' affidavit artfully out of context in support of her argument that he either saw her or was deliberately indifferent in not seeing her. In his affidavit, Trooper Reeves states that when Norris was in a prone position and Trooper Reeves knew he was on his last magazine, he slowed his firing. *Docket No. 131-1 at 4*. Plaintiff cites to his next sentence only, "I knew I needed to make sure I took my time on shots," and argues that he must have seen her and cannot argue that he was forced to make split-second judgments. Trooper Reeves was under fire immediately after he performed the TVI. He was forced to make split-second judgments, including the decision to slow fire when running low on ammunition.

even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful." *Childress v. City of Arapaho*, 210 F.3d 1154, 1156 (10th Cir. 2000) (citing *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989)). In *Childress*, officers returned fired at prisoners in a van even though hostages were inside. The hostages were struck. The Tenth Circuit found that the seizure was not willful, and thus the officers did not violate the Fourth Amendment. Id. at 1157.

Under *Childress*, if Trooper Reeves had known that Plaintiff was a hostage, he did not violate her Fourth Amendment rights.[13] The fact that Trooper Reeves thought Plaintiff was a suspect does not change the analysis in this case. As Plaintiff argues, she was unarmed, not threatening him, not advancing on him, and not attempting to flee. Nevertheless, that fact played no part in Trooper Reeves's actions. He did not see her while he was returning Norris's fire. There is no evidence that he intentionally shot her. There is no evidence that he would have shot her intentionally if he had seen her. As he was not attempting to shoot Plaintiff, the seizure was not willful.

The *Childress* Court also determined that the officers did not violate the plaintiff's Fourteenth Amendment substantive due process rights. "[I]n a high-speed automobile chase aimed at apprehending a suspected offender . . . only a purpose to cause harm unrelated to the legitimate object of arrest' is sufficiently 'shocking to the conscience' to establish a due process violation." *Id*. (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 836 (1998)). "Police officers giving chase make decisions '*in haste, under pressure, and frequently without the luxury of a second chance*.'" *Id*. (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 853

---

[13] The court is not persuaded by Plaintiff's argument that the analysis changes once the vehicle is stopped. Gunfire was being exchanged. Norris began shooting before Trooper Reeves could even exit his patrol unit.

14

(1998) (emphasis added)). Moreover, the *Childress* Court opined that ***the Lewis principles "apply whether the claimant is a police suspect or an innocent victim***. The touchstone is whether the officers 'acted with an intent to harm the participants or to worsen their legal plight.'" *Id*. at 1157-58 (emphasis added).

Here, there is no evidence that Trooper Reeves acted with intent to harm Plaintiff. Like in *Childress*, Plaintiff argues that Trooper Reeves was grossly negligent, reckless or even deliberately indifferent – by not finding out whether she was a hostage and by not seeing her. But also like in *Childress*, there is no evidence he intended to harm her. There is also no evidence that Trooper Reeves acted any differently than he would or could have had he known she was a hostage. "Thus, there is no constitutional liability under *Lewis*." *Id*. at 1158.

Trooper Reeves did not violate Plaintiff's constitutional rights when he returned Norris' fire and accidentally shot her. He is entitled, therefore, to qualified immunity. He is also entitled to qualified immunity based on the second prong of the test – Plaintiff has not shown that Trooper Reeves violated a clearly established right under these circumstances. She has not brought forth any clearly established law particularized to the facts of this case. Trooper Reeves' summary judgment motion, therefore, is granted.

### *Sheriff Ledbetter*[14]

Plaintiff brings claims against Sheriff Ledbetter for inadequate policies and training, alleging that Deputy Hall violated her constitutional rights. Deputy Hall was the last officer to arrive on the scene while the shooting was still taking place. Plaintiff was already on the ground when Deputy Hall arrived. Assessing Norris as a threat, Deputy Hall fired two shots at his torso.

---

[14] Plaintiff did not respond to Sheriff Ledbetter's qualified immunity defense. The court does not believe she intended to bring any individual capacity claim against Sheriff Ledbetter, but to the extent she did, the motion is granted.

While Deputy Hall did see Plaintiff lying on the ground in front of Norris, he did not intend to shoot Plaintiff. As with Trooper Reeves, Deputy Hall believed Plaintiff was a suspect. Nevertheless, there is no evidence that he would have or could have acted any differently had he known she was a hostage. He saw Norris with a gun, and he returned fire at Norris. There is no evidence he intended to harm Plaintiff. Under *Childress*, it is clear he did not violate her constitutional rights.

As Deputy Hall did not violate Plaintiff's constitutional rights, the municipality cannot be held liable under a theory of inadequate policies, customs or training. *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers."). Furthermore, as Sheriff Ledbetter argues, Plaintiff has not shown that any violation resulted from its policies or customs or from a lack of training. In fact, Plaintiff admitted all of Sheriff Ledbetter's facts regarding training, policies and procedures of the McIntosh County Sheriff's Office, including that it has policies against excessive force.

Plaintiff also has not shown any specific training deficiency that was closely related to the alleged violations of her constitutional rights. To prevail on a claim of failure to train or supervise, Plaintiff must show "a specific deficiency" in the Sheriff's training program closely related to her alleged injuries and that the deficiency caused Deputy Hall to act with deliberate indifference to her safety. *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999). In fact, as stated in the undisputed material facts, Deputy Hall was trained regarding what is necessary and proper to attempt to disable a threat and trained not to purposefully attempt to harm an individual who is not a threat to that officer, other officers, or the general public. Sheriff Ledbetter's motion for summary judgment is granted.

## IV. Conclusion and Other Motions

The motion for summary judgment by Sheriff Ledbetter [Docket No. 130] is hereby GRANTED. The motion for summary judgment by Trooper Reeves [Docket No. 131] is also hereby GRANTED.

The motion for contempt citation by Plaintiff [Docket No. 123] is DENIED as MOOT for reasons stated in the responses thereto [Docket Nos. 145 and 147]. As the summary judgment motions have been granted, the motions in limine and to exclude expert testimony and reports [Docket Nos. 136, 137, 139, 140, 141, and 142] are also MOOT.

**IT IS SO ORDERED** this 4th day of March, 2020.

_____
**THE HONORABLE RONALD A. WHITE
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF OKLAHOMA**