## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

JULIE HUFF,

      *Plaintiff,*

  vs.

CHRISTOPHER REEVES,

      *Defendant.*

Case No. 18-22-EFM

## MEMORANDUM AND ORDER

On January 21, 2016, Cedric Norris robbed a bank in Eufaula, Oklahoma. Norris shot and killed the bank president, and fled the scene with a hostage, Plaintiff Julie Huff. Norris forced Plaintiff to drive at gunpoint, but the vehicle was subsequently found and stopped by law enforcement officers, including Oklahoma Highway Trooper Chris Reeves. In the ensuing shootout, the officers killed Norris. But they also shot Plaintiff multiple times. Plaintiff subsequently sued the officers involved, the City of Eufaula and its Chief of Police, and McIntosh County Sheriff Kevin Ledbetter.

Following an extensive procedural history, the only remaining claim is Plaintiff's 42 U.S.C. § 1983 claim that Defendant Reeves' actions violated her Fourth Amendment rights. The matter is now before the Court on Plaintiff's Motion for Partial Summary Judgment (Doc. 245), two Motions to Exclude Expert Witnesses by Defendant (Docs. 139, 140), and Plaintiff's request

for a contempt citation.  (Doc. 123).  The Court grants the Motion for Partial Summary Judgment as provided herein, and denies the remaining motions.

## I.        Factual and Procedural Background

According to Plaintiff's Second Amended Complaint, Norris entered the Bank of Eufaula and immediately shot and killed the bank president.  Brandishing his gun, Norris grabbed cash from one of the tellers, and approached another bank employee and demanded that she accompany him as a hostage.  When she refused, Norris shot her in the abdomen, and also shot at another employee who tried to intervene.  Norris then demanded that Plaintiff, a bank customer, drive his vehicle, which he had stolen earlier.

The getaway vehicle was subsequently stopped by law enforcement officers including Highway Patrolman Reeves, Eufaula Police Officer Casey Torix, and McIntosh Sheriff's office deputies.  Plaintiff states that she "exited the vehicle and began running into a nearby field," while Norris exchanged fire with the officers.  "Norris then caught up to [Plaintiff] and put his arm around her neck and began using her as a human shield.  He held her in front of him, in full view of law enforcement personnel."  Although the officers could see she was a hostage, "they continued to fire their weapons [and] literally shot through an innocent hostage  . . . in an effort to kill Mr. Norris."  Plaintiff was struck approximately nine times by the officers.  Plaintiff alleges that the officers "had sufficient time to focus on their target before pulling the trigger and deliberate whether to shoot at or through the hostage."

In his April 6, 2016 summary of his investigation, the local District Attorney found that after the vehicle was stopped, both Norris and Plaintiff exited and moved into an open field.  Norris used Plaintiff as a human shield while shooting at the Troopers.  The officers, according to the District Attorney, returned fire "to protect themselves and eliminate the deadly force threat

that Norris was creating." The officers' gunfire killed Norris, but "Ms. Huff also received multiple gunshot wounds." The District Attorney concluded that the officers "faced an armed person that they had had probable cause to believe had murdered one person, shot another, and robed a Bank at gunpoint," and that the Troopers were justified in their use of force pursuant to 21 O.S. § 733(2)(a) and (b).

In the present § 1983 action, Plaintiff brought claims against Trooper Reeves for violation of her rights under the Fourth and Fourteenth Amendments. She also sued Sheriff Ledbetter for failing to train his deputies.

The Court granted summary judgment to both Defendants on March 4, 2020. The Court ruled Defendant Reeves was not liable because he did not shoot Plaintiff intentionally. And Defendant Ledbetter was not liable because Plaintiff had not shown a predicate constitutional violation by one of any county deputy, and had failed to identify any specific training deficiency related to the alleged violation.

Plaintiff appealed. The Tenth Circuit affirmed the dismissal of the Fourteenth Amendment claim against Trooper Reeves and the failure-to-train claim against the Sheriff. However, the court reversed the dismissal of the Fourth Amendment claim, finding that there was an issue of fact whether Reeves intended to shoot Plaintiff.

The court observed that the Defendant would not be liable "if the evidence established that Trooper Reeves was shooting only at Norris and the wounds to Ms. Huff were just 'the unfortunate . . . accidental effects of otherwise lawful conduct.' "[1] But "[i]f [he] intentionally shot Ms. Huff (perhaps because he thought she was implicated in the robbery and murder)" he

---

[1] *Huff v. Reeves*, 996 F.3d 1082, 1088 (10th Cir. 2021) (quoting *Childress v. City of Arapaho*, 210 F.3d 1154, 1157 (internal quotation marks omitted)).

would not be protected by qualified immunity."[2]   The court concluded that there was evidence that would support a conclusion that the Trooper intentionally shot Plaintiff, noting both the number of times she was stuck by bullets (10 times, against the 4 times Norris was hit) and Plaintiff's statement that she exited the vehicle and approached the Troopers with her hands up, and thus posed no reasonable threat.   "Perhaps Reeves reasonably viewed the situation otherwise, viewing her as an accomplice to murder who was shooting at him.  But that is a question for the jury."[3]

## II.     Legal Standard

### A.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[4] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[5]   The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[6]   The nonmovant must then bring forth specific facts showing a genuine issue for trial.[7]   These facts must be clearly identified through affidavits, deposition transcripts,

---

[2] *Id.*

[3] *Id.* at 1090.

[4] Fed. R. Civ. P. 56(a).

[5] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citation omitted), *overruled on other grounds by Bertsch v. Overstock.com*, 684 F.3d 1023, 1029 (10th Cir. 2012).

[6] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[8]  The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[9]

Federal Rule of Evidence 702 governs expert testimony. It provides that a witness "qualified as an expert by knowledge, skill, experience, training, or education" may provide opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.[10]

## B.     Rule 702 and *Daubert*

Rule 702 imposes a "gatekeeping role" upon the district court to ensure that expert testimony is relevant and reliable and that it will assist the trier of fact.[11]  Under this rule, the Court must first "determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion."[12]  If so, the Court "must determine whether the

---

[8] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[9] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

[10] Fed. R. Evid. 702.

[11] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018) (citing *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009)).

[12] *Schulenberg*, 911 F.3d at 1282 (internal quotation marks and citation omitted).

expert's opinion is reliable by assessing the underlying reasoning and methodology."[13]   And finally, the Court must examine "whether [the] proposed testimony is sufficiently 'relevant to the task at hand.' "[14]   "Relevant evidence 'means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' "[15]   The party offering the expert testimony bears the burden of showing that it is admissible.[16]

"The [C]ourt has discretion to determine how to perform its gatekeeping function under *Daubert*."[17]   The Court may, but is not required to, conduct a *Daubert* hearing to fulfill this role.[18]   Here, neither party has requested a *Daubert* hearing, and after reviewing the parties' briefs, the Court concludes that the motion can be decided without a *Daubert* hearing.

### III.    Analysis

### A.    The Court denies the Motion to Exclude the testimony of Scott DeFoe.

Defendant has moved to exclude as unreliable the testimony of two experts retained by Plaintiff, Scott DeFoe and Dr. Bennet Omalu, M.D.   DeFoe joined the Los Angeles Police Department in 1989, and retired in 2010. While at the Department, he was promoted to the ranks of Detective and Sergeant II, and has an extensive background in police procedures including the

---

[13] *Id*. at 1283 (quotation marks and citation omitted).

[14] *Bitler v. A.O. Smith Corp*., 400 F.3d 1227, 1234 (10th Cir. 2005) (quoting *Daubert*, 509 U.S. at 597).

[15] *Id.* (quoting Fed. R. Evid. 401).

[16] *Nacchio*, 555 F.3d at 1241.

[17] *In re EpiPen* (*Epinephrine Injection, USP*) *Mktg. Sales Practices & Antitrust Litig*., 2020 WL 1164869, at *3 (D. Kan. 2020) (citing *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019)).

[18] *Id*. (*citing Goebel v. Denver & Rio Grande W. R.R. Co*., 215 F.3d 1083, 1087 (10th Cir. 2000)).

use of deadly force. DeFoe has a lengthy history of service in and supervision of Special Weapons and Tactics units. Since his retirement, DeFoe has worked as the director for a private security company, a consultant, and as a Deputy Sheriff in Riverside, California.

With respect to DeFoe, Defendant agrees that he "appears to have the qualification of a use of force expert," but argues ("Proposition I") that he offers "rank speculation" amounting to mere "second guessing officers in rapidly evolving situations," advances unreliable opinions, and that his opinions would invade the province of the jury. Defendant argues that DeFoe's conclusions cannot be reliable because Plaintiff declined to depose the officers at the scene. He challenges as contrary to the evidence the opinion of DeFoe that the use of force was unjustified pursuant to the leading case of *Graham v. Conner*.[19] Defendant further disputes DeFoe's assessment that the officers used an level of excessive force based on the volume of gunfire, because "the number of shots fired do not a constitutional violation make."

The Court denies the motion. Defendant's claims that DeFoe's opinions should be excluded because they ("Proposition II") are unreliable or ("Proposition III") invade the province of the jury are both purely conclusory and fail to identify any particular opinions by DeFoe which would be objectionable. Both claims are merely tacked onto Defendant's brief as separate grounds for exclusion, but are in fact wholly dependent on Defendant's "Proposition I" arguments summarized above.

And those arguments are unpersuasive. Defendant argues that DeFoe's opinion must be rejected because the use of force was reasonable under *Graham v. Conner*. But the Tenth Circuit in its opinion, rendered after Defendant's Motion to Exclude, expressly noted the four-factor

---

[19] 490 U.S. 386 (1989).

*Graham* test, and observed that notwithstanding that decision, "officers are prohibited from using deadly force against a person when it is apparent that the person poses no physical threat to the officers or others."[20]

Defendant supplies no authority for the proposition that an expert's opinion must necessarily be rejected for failing to account for hypothetical deposition testimony which never occurred. This is particularly true here, where the versions of what occurred are so drastically different. Plaintiff has testified that she exited the vehicle and approached the officers with her hands up when she was first shot. As the Tenth Circuit observed, "[i]f her version of events is believed, she was not evading apprehension and she posed no threat to the officers or anyone else."[21] The decision of Plaintiff's counsel not to depose the officers was a tactical decision which may or may not have been unwise. But the general thrust of the officer's version of events is nonetheless present in the record, and Defendant has failed to show that DeFoe's report ignores any specific evidence available to him, or that it must be rejected for siding with Plaintiff's version of events.

Similarly lacking in merit is Defendant's claim that DeFoe's opinions should be rejected because he relies in part on the volume of fire delivered by the officers. Defendant supports his argument by citing decisions such *Childress*, stressing that in that decision the officers fired 21 rounds at a suspect vehicle fleeing the police in an attempt to disable it.[22]

---

[20] *See Huff*, 996 F.3d at 1090 (citing cases).

[21] *Id.*

[22] *Childress v. City of Arapaho*, 210 F.3d 1154, 156 (10th Cir. 2000)..

But in the cited decision the court did not hold that the number of shots is never relevant to a use of force analysis. Rather, the court found no Fourth Amendment violation existed because the officers "made every effort to deliver [the plaintiffs] from unlawful abduction," and the plaintiffs' injuries were "the unfortunate but not unconstitutional accidental effects of otherwise lawful conduct."[23] The critical issue in *Childress* was the *reason* the officers fired at the suspect vehicle, not *the number of shots fired*. As the Tenth Circuit noted in its opinion in the present case, "*Childress* is not in point," because there was evidence from which a jury could find the level of force used was excessive.[24]

Of course, the number of shots fired by an officer will not establish *by itself* that the force used was unreasonable.[25] But this does not mean that the number shots fired can never be relevant to the issue of unreasonable force. Indeed, in resolving that question in the appeal in the present case, the Tenth Circuit noted in particular the officers' volume of fire as one of the grounds for which a jury might reasonably conclude the force was excessive.[26] Other courts have expressly concluded that the number of shots fired may be relevant to an excessive force

---

[23] *Id*. at 1157 (citation and internal quotation omitted).

[24] *Huff*, 996 F.3d at 1088.

[25] *See Cooper v. Rutherford*, 503 F. App'x 672, 676 (11th Cir. 2012) ("[W]e cannot find a single case in this circuit or from the Supreme Court that clearly establishes that a large number of shots fired makes a reasonable use of deadly force unreasonable.").

[26] Thus, the court in *Huff* observed, 996 F.3d at 1088-89:

To begin with, the very fact that Ms. Huff was repeatedly struck by bullets from Reeves's gun strongly implies that she was in his line of sight. The shooting was in broad daylight. And the fact that she was struck by bullets so often (at least 10 times) makes it hard to believe that she was not being aimed at. Nor can her being struck so often be blamed on her proximity to Norris, who was struck only four times, compared to her 10.

analysis.[27]   The Court finds that DeFoe's report is not unreliable for its reliance, in part, on the number of times the officers fired their weapons.

**B.      The Court denies the Motion to Exclude the testimony of Dr. Omalu.**

Dr. Omalu has opined, based on in part on CT images of Plaintiff's hips and pelvis which show an embedded bullet core and jacket, that the bullet was most likely from a .357 caliber firearm.

Dr. Omalu is a physician, board-certified in anatomic pathology, clinical pathology, forensic pathology, neuropathology, and medical management.   He is licensed to practice medicine in four states, has practice privileges in four hospitals or clinics, is a member or fellow in nearly two dozen medical societies, and has authored or co-authored numerous articles in peer-reviewed medical journals.

Defendant agrees that Dr. Omalu is "a renowned doctor and pathologist," notable as the first doctor to discover repeated brain trauma in American football players.   But, Defendant argues that, while Dr. Omalu may have some general training as a pathologist, he "fails to provide a basis to qualify him to be an expert on bullet size or weaponry firing a specific bullett [sic]."   Second, he argues that the bullet was so deformed that Dr. Omalu's conclusion is pure speculation.   Finally Defendant argues that Dr. Omalu should be excluded "given his potential to be glamorized for his work in the area of CTE with the NFL, and because he was portrayed by Will Smith in a wide (sic) release movie."

---

[27] *See Margeson v. White Cnty.*, 579 F. App'x 466 (6th Cir. 2014) ("While the number of shots fired is not itself dispositive, the large number in this case is certainly relevant" under the facts in the case); *Nelson v. Thurston Cnty.*, 2022 WL 4598475, at *3 (W.D. Wash. 2022) ("The excessive force claim will turn, in part, on the number of shots fired and their trajectory.").

Defendant's last contention, touching on Dr. Omalu's potential notoriety, is no grounds for complete exclusion of his testimony. Any risk of unfair prejudice to Defendant may be cured by an appropriate order in limine prohibiting reference to Dr. Omalu's work regarding NFL player head injuries.

Dr. Omalu states in his report that he believes the bullet which struck Plaintiff came from a 0.357 caliber firearm. He states that he used the magnification feature of the CT scan software to measure the bullet core:

> in four separate planes, after zooming in at about 305%. The four diameters were 7.89 mm, 8.00 mm, 8.13 mm, and 8.35 mm. These diameters will give a mean diameter of 8.09 mm, which when converted to inches would be 0.318 inches. [1.0 mm is equal to 0.039 inches]. The final caliber of the intact bullet/cartridge with the bullet jacket in place, therefore, would be larger than but close to 0.318 inches.

> The bullet core in this instance, embedded in the right pelvis of Julie Huff, more likely than not came from a cartridge that was larger than, but closer to 0.318 inches. Given the prevailing terminal forensic scenario in this case, the bullet core came from one of these three caliber cartridges: 0.40 caliber, 0.357 caliber, or 0.45 caliber. This bullet core, more like that not, and most probably came form a 0.357 caliber cartridge.

The Court denies Defendant's motion to exclude Dr. Omalu's testimony on the basis of a lack of experience. Plaintiff responded to the motion with additional information from Dr. Omalu indicating that he has extensive history in identifying bullet calibers, performing this task on a weekly if not daily basis, on hundreds of occasions. Defendant has supplied no rejoinder in support of his motion after the submission of the additional affidavit from Dr. Omalu. The Court finds that Dr. Omalu's report may not be excluded on the ground cited.

How Dr. Omalu reaches this conclusion is unclear. He describes the bullet jacket as "markedly deformed," while the bullet core is only "mildly deformed." Yet his own measurements give four widely divergent measures for the bullet core. Dr. Omalu then

- 11 -

simplistically splits the difference by taking then arithmetic mean to yield a 8.09 mm/0.318 inch bullet.  In his report, he offers no detailed explanation for the conclusion that a .357 caliber bullet is "probably" responsible.  Nor does the report explain why Dr. Omalu excludes consideration of extremely popular 9 mm (.355 inch) caliber.[28]

More importantly, the relevance of Dr. Omalu's testimony is not clear.  Defendant states—again, purely in passing—that Dr. Omalu's opinion as to bullet caliber does not narrow down who the shooter was, and observes that the position of the officers, after all, is not that they did not shoot Plaintiff, but that they were trying to shoot at Norris.  But Defendant makes this remark only in passing in the introduction to his motion, and it is not developed or cited in the specific grounds for exclusion set forth in detail later in the motion.

Plaintiff's response is not particularly helpful.  Beyond offering the additional information about Dr. Omalu's experience in identifying bullet calibers, Plaintiff merely states that "[i]t is important to Plaintiff's case to identify which officers shot her and how many times."  Neither Plaintiff nor Defendant explain how a .357 caliber bullet would be probative of having been fired by any particular officer.

Defendant does not develop these arguments in his Motion to Exclude in any detail.  Rather, the motion asserts in a purely conclusory fashion that the Dr. Omalu's calculations are unreliable, stressing that the bullet jacket was "markedly deformed."  But, as noted above, the this refers only to the bullet jacket.  Dr. Omalu describes the bullet core as only "mildly deformed," and that it is the core from which the weapon's caliber is determined.

---

[28] *See NPR v. FBI*, 539 F.Supp. 3d 1, 6 (D.D.C. 2021) (reiterating its preliminary findings, including its description of 9 mm as "run-of-the-mill ammunition . . .in common use for decades.").

The motion, as articulated in Defendant's pleading, is denied without prejudice. However, the Court may require some additional showing of relevance prior to any testimony by Dr. Omalu.

**C.    Motion for Partial Summary Judgment**

In her Motion for Partial Summary Judgment, Plaintiff seeks a determination as to the extent of her potential recovery against Defendant's insurance carrier, National Union Fire Insurance Company.  Plaintiff argues that the issue arises because the Defendant, in the most recent Joint Status Report filed by the parties, includes as a defense: "E.  Plaintiff's recoverable damages are limited by state law."

According to Plaintiff, counsel for Defendant subsequently explained in an email that " 'Recoverable damages" refers to the ability to collect on a judgment. The ability to collect a judgment against a state employee is limited by state law."  Citing *Gabovitch v. Lundy*,[29] counsel further wrote that, "State law provides the exclusive method of collecting federal judgments." Plaintiff interprets this to mean that Defendant's counsel was claiming that a provision of the Oklahoma Governmental Tort Claims Act (GTCA) would limit her judgment in the action.[30] Specifically, she cites a provision limiting claims against the State or its subdivisions to $175,000.[31]

---

[29] 584 F.2d 559 (1st Cir. 1978).

[30] Okla. Stat. tit. 51, § 151 *et seq.*

[31] Okla. Stat. tit. 51, 154(A)(2) ("The total liability of the state and its political subdivisions on claims within the scope of The Governmental Tort Claims Act . . . shall not exceed . . . One Hundred Twenty-five Thousand Dollars ($125,000.00) to any claimant for a claim for any other loss arising out of a single act, accident, or occurrence.").

Plaintiff argues that the cited section of the GTCA simply cannot limit her ability to recover damages in this federal civil rights action, brought against Defendant Reeves in his individual capacity. And even if the state law did somehow control, the Act itself provides that the damages cap applies after any applicable insurance policy is exhausted. The relevant portion of the statute provides:

> If a policy or contract of liability insurance covering the state or political subdivision or its employees is applicable, the terms of the policy govern the rights and obligations of the state or political subdivision and the insurer with respect to the investigation, settlement, payment and defense of claims or suits against the state or political subdivision or its employees covered by the policy. However, the insurer may not enter into a settlement for an amount which exceeds the insurance coverage without the approval of the governing body of the state or political subdivision or its designated representative if the state or political subdivision is insured.[32]

In Response, Defendant states that counsel was not attempting to invoke the GTCA as a limit on the judgment which the jury might award:

> For their part, neither Defendant Reeves nor his counsel has ever stated, argued, implied, or suggested that the $175,000.00 damages cap applicable to tort claims brought against the State of Oklahoma under the GTCA limits the amount of damages that may be awarded against an individual state actor in an action brought against that state actor under § 1983. In fact, the undersigned has specifically advised Plaintiff's counsel on multiple occasions that this is not Defendant's position. To be clear, Defendant Reeves does not now, nor has he ever, contended that the GTCA damages cap applicable to the State of Oklahoma in tort claims actions brought against the State limits the damages that may be awarded to Plaintiff against Defendant Reeves under § 1983.

Defendant's counsel expressly acknowledges that "the GTCA damages-limitation provision applies only to claims against the State and is not intended to create damages immunity to state actors sued under § 1983." Instead, Plaintiff states only that state procedures may ultimately

---

[32] Okla. Stat. tit. 51, § 158(C).

affect how Plaintiff might collect on any judgment, and also states the relevant insurance policy provides for a limitation on the ability to recover for "bodily injury."  Counsel states that Defendant's position is merely that the policy itself may potentially affect on Plaintiff's ability to collect any hypothetical judgment.

Both for good cause shown and in light of Defendant's express admission, the Court grants Plaintiff's motion, and formally denies and overrules any claim or argument that the provisions of the GTCA would somehow limit the amount of judgment in this case.

Beyond this, however, the Court finds no grounds for additional relief.  In her Reply, Plaintiff not only again invokes the email communication which prompted her motion, but also challenges Defendant's construction of the Policy's "bodily injury" as a potential limitation on her recovery, and suggests that an award beyond policy limits could expose the insurer to an action for bad faith under Oklahoma law.

The Court finds that it lacks the authority to resolve such hypothetical arguments.  In his Response, Defendant had noted Oklahoma cases which have recognized that a plaintiff generally lacks standing to seek an authoritative construction of a defendant's insurance policy.  Thus, the Oklahoma Supreme Court has observed that a plaintiff "has no legally cognizable or protectible interest in the controversy and he will not have one unless and until he should succeed in the negligence action, for it is only at that point that [the insurer] may have a legal obligation to pay."[33]

---

[33] *Knight ex rel. Ellis v. Miller*, 2008 OK 81, 195 P.3d 372, 375 (2008) ("Knight [the plaintiff] is a stranger to the insurance contract between Empire and Timeline and does not have a judgment against an Empire-insured. He is seeking a declaration that Empire is obligated to pay any judgment he may recover against Timeline or its employee Miller, but there is no judgment in existence and there may never be one.").  *See also Wausau Underwriters Ins. Co. v. Superior Linen Serv., Inc*., 2013 WL 5774956, at * (N.D. Okla. 2013) (citing *Knight*, 195 P.3d at 375).

Plaintiff argues in her Reply that these cases are distinguishable because they involve declaratory judgment actions. But, if anything, the fact that the present action is not a statutory action for declaratory judgment but an independent liability action by Plaintiff who hopes for a favorable final judgment, renders the lack of standing more acute.

Absent some specific statutory authorization, an injured party generally lacks standing under Oklahoma law to bring a direct action against an insurance company.[34] Standing may arise after an injured party obtains a final judgment,[35] but no such judgment exists in the present action. Plaintiff cites no authority suggesting that the Court, prior to the entry of any judgment in her favor, has the power to interpret and construct an insurance policy to which she is a stranger.

**D.    Motion for Contempt Citation**

Prior to the Court's award of Summary Judgment, Plaintiff moved for a contempt citation against the Oklahoma Highway Patrol for failing to provide documents subject to a subpoena duces tecum issued August 8, 2019. The subpoena required production of documents relating to the Patrol's policies on use of force, vehicle pursuit, and vehicle intervention which were in effect at the time of the shooting.

As with the various Motions in Limine and the Defendant's *Daubert* motions, the Court denied the contempt motion on March 4, 2020 as moot given its contemporaneous award of summary judgment. But, like those other motions, the request for a contempt citation became

---

[34] *Daigle v. Hamilton*, 1989 OK 137, 782 P.2 1379, 1383 (1989).

[35] *Fry v. American Home Assur. Co.*, 2015 WL 519706, at *1 (E.D. Okla. 2015).

- 16 -

again actively at issue after the Tenth Circuit's decision in 2021 which reversed in part the award of summary judgment.

The relevant Rule provides that a contempt citation may be issued by "[t]he court for the district where compliance is required."[36] The relevant subpoena was issued to the headquarters of the Patrol in Oklahoma City, and required production of the relevant documents to counsel's office in Tulsa.

Although the relevant documents were to be received by counsel in the Eastern District of Oklahoma, Rule 45 required Plaintiff to first seek to enforce compliance in the Western District. Under the Rule, a person may be subpoenaed as a witness either "within 100 miles of where the person resides, is employed or regularly transacts business," or anywhere in the state where he or she resides if either a party to the action or the travel will not incur substantial expense.[37] But the Rule defines the "Place of Compliance" differently for document subpoenas, stating that the subpoena "may command . . . production of documents . . . at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person."[38]

Courts have taken this to mean that the "Place of Compliance" is not place the documents are to be delivered, but where documents are kept.[39] Governmental agencies and corporate

---

[36] Fed. R. Civ. P. 45(g).

[37] Fed. R. Civ. P. 45(c)(1).

[38] Fed. R. Civ. P. 45(c)(2)(A).

[39] *See Burnett v. Shalburgers Franchising*, 2018 WL 10466827, *2 (E.D.N.Y. 2018) (Subpoena seeking delivery to New York of records held by California company was invalid, as "the proper forum for the motion to compel would be in the district in California where the nonparty's headquarters are located, not where the files are to be produced."); *Sandifer v. Hoyt Archery, Inc.*, 2014 WL 3540812, at *4 (M.D. La. 2014) ("A subpoena requiring a nonparty to produce documents at a place more than 100 miles away is invalid."); *Great Lakes Ins., S.E. v. Gray Grp. Invs., LLC*, 2021 WL 7708048, at *9 (E.D. La. 2021) (quashing subpoena for production of documents where subpoena "required production at a location more than 100 miles from the non-party's location.").

entities are deemed to reside where they are headquartered.[40]  A subpoena directing a non-party to deliver documents more than 100 miles from its headquarters is "facially defective."

Here, the subpoena directed the Oklahoma Highway Patrol to deliver its records to the offices of Plaintiff's attorneys in Tulsa, Oklahoma.  The subpoena was invalid on its face because it directed the Patrol to deliver the documents 102 miles from its headquarters.[41]  Further, to the extent Plaintiff wanted to compel such production by a contempt citation, Rule 45(g) requires that this occur in "[t]he court for the district where compliance is required."[42]  In the present case, that would be Western District of Oklahoma.  This Court, "the issuing court," only has authority to issue a contempt citation if the Plaintiff had first moved for compliance in the Western District, and that court formally transferred the request here.

Even if the Court were otherwise empowered by Rule 45 to hold the Patrol in contempt, the Plaintiff's request is precipitous.  "In civil litigation, it would be rare for a court to use contempt sanctions without first ordering compliance with a subpoena."[43]  Because contempt sanctions are "avoidable through obedience," they are appropriately imposed only after giving "notice and an opportunity to be heard" to the alleged contemnor.[44]

---

[40] *Gable v. United States*, 2013 WL 12498292, at *1 (D.D.C. 2013) ("[A] valid subpoena can only be issued to the government agencies . . . within 100 miles of th[e] location" where delivery as to occur); *SEC v. TCA Fund Mgmt. Grp. Corp.*, 2021 WL 9440378, at *1 (S.D. Fla. 2021)

[41] Driving Directions from Patrol headquarters to counsel's offices, www.google.com/maps, (last visited April 3, 2023).  *See, e.g., Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (taking judicial notice of a map provided by Google Maps because its "accuracy cannot reasonably by questioned") (quoting Fed. R. Evid. 201(b)); *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1218 n.2 (10th Cir. 2007) (taking judicial notice of distance calculation that relied on information provided by Google Maps).

[42] Fed. R. Civ. P. 45(g).

[43] Fed. R. Civ. P. 45(g) advisory committee's note to 2013 amendment.

[44] *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994).

Therefore, the application for a citation of contempt is denied.

The Court will address the pending Motions in Limine at a hearing to be scheduled by separate order.

**IT IS THEREFORE ORDERED** that Plaintiff's Application for Contempt Citation (Doc. 123) and Defendant's Motions to Exclude (Docs. 139, 140) are hereby **DENIED**, Plaintiff's Motion for Partial Summary Judgment  (Doc. 245) is **GRANTED AS PROVIDED HEREIN.**

**IT IS SO ORDERED**.

Dated this 3rd day of April, 2023.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE